# FILED

UNITED STATES DISTRICT COURT
DENVER, COLORADO

MAR 1 9 2015

JEFFREY P. COLWELL
CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| **PAUL A. MITCHELL**<br>Plaintiff, | Civil Action No.: |
| **v.** | Verified Complaint |
| **KAREN MCGOVERN**<br>(In Individual Capacity as Current Program Director of<br>the Colorado Medical Board) | |
| **CHERYL HARA**<br>(In Individual Capacity as Former Program Director of<br>the Colorado Medical Board) | '15 – CV – 00559 |
| Defendants. | |

## TABLE OF CONTENTS

I.      JURISDICTION

II.     VENUE

III.    PARTIES

IV.     BACKGROUND

V.      FACTUAL HISTORY

VI.     SECTION 1981 CAUSES OF ACTION
      A.      Making and Enforcing Contract with CMB
      B.      Interference with Making and Enforcing Contract with RMCC
      C.      Making and Enforcing Contract with Others
      D.      Interference with CPHP Confidentiality Contract
      E.      Full and Equal Benefit of All Laws and Proceedings for the Security of Property
      F.      Unlike Punishment

VII.    SECTION 1983 CAUSES OF ACTION
      A.      PROPERTY INTERESTS VIOLATION
            1.      Property Interest in Suspended License
            2.      Lack of Pre-Suspension Due Process
            3.      Suspension Due Process Deprivations
            4.      Post-Suspension Due Process Deprivations
      B.      LIBERTY INTERESTS DUE PROCESSS DEPRIVATIONS
            1.      Violation of Liberty Interests to National Practitioner Data Bank.
            2.      Violation of Liberty Interest in Publication of the 118(9)(a) order
            3.      Violation of Liberty Interest in Publication of § 118(9)(a) Suspension
      C.      EQUAL PROTECTION DEPRIVATION

          **1.**       **Unequal Pre-Suspension Protection**
          **2.**       **Unequal Suspension**
          **3.**       **Unequal Post-Suspension Protection**
    **D.**      **CONSPIRACY TO VIOLATE RIGHTS IN VIOLATION OF 42 U.S.C. § 1983**
          **1.**       **Conspiracy to Violate 42 U.S.C. § 2000(a)**
          **2.**       **Conspiracy to Violate 42 U.S.C. § 2000(e)-2 and (e)-3 Conspiracy**
          **3.**       **Conspiracy to Violate Equal Protection**

**VIII.**   **CONSPIRACY IN VIOLATION OF 42 U.S.C. §1985(3)**
    **A.**      **Conspiracy to Suspend Medical License**
    **B.**      **Conspiracy to Deny Access to State and Federal Courts**

**X.**     **PRAYER FOR RELIEF**

## JURISDICTION

Plaintiff claims federal jurisdiction pursuant to Article III § 2, which extends the jurisdiction to cases arising under the U.S. Constitution.

This Court has original jurisdiction over Plaintiff's constitutional and federal law claims pursuant of 28 U.S.C. § 1331 and 28 U.S.C. 1343.   28 U.S.C. 1331confers jurisdiction on federal courts to review agency action.

Plaintiff brings this suit in violation of § 1983 for violations of certain protections guaranteed to him by the Fourteenth Amendment of the federal Constitution and the Civil Rights Act of 1964, by the defendants in their individual and official capacity as former and current  program director in the Colorado Medical Board.

Also, Plaintiff brings this suit in violation of § 1985(3) for conspiracy for the purpose of depriving Plaintiff of equal protection of the laws or equal privileges under the laws.

The Colorado's Administrative Procedures Act ("APA") provides plaintiffs with rights to seek redress for the acts of Colorado agencies that cause them harm.

> *An action may be commenced in any court of competent jurisdiction by or on behalf of an agency for judicial enforcement of any final order of such agency. In any such action, any person adversely affected or aggrieved by such agency action may obtain judicial review of such agency action.*

§ 24-4-106(3).  This district court has jurisdiction over APA review under 28 U.S.C. § 1331.

The APA does not provide an independent jurisdictional basis except when 28 U.S.C. § 1331 is

invoked, as in this matter. *See Browen v. Massachusetts,* 487 U.S. 879, 891 n.16 (1988). The APA prohibits the award of money damages, so Plaintiff seeks a declaratory judgment and specific, equitable relief to reverse statements made to the National Practitioner Data Bank ("NPDB")

## VENUE

All Defendants reside in the United States District Court of Colorado while Plaintiff resides in North Carolina. Since all Defendants reside and may be found in the District of Colorado and all events giving rise to these claims occurred in the District of Colorado, the venue is proper.

## PARTIES

Plaintiff Paul A. Mitchell ("Mitchell") is a citizen of the United States and a former resident of Colorado. He currently is a resident of North Carolina and resides at 508 E. Mulberry Street, Goldsboro, NC 27530

Defendant Karen McGovern is a citizen of the United States who is the current Program Director of the Colorado Medical Board and works at 1560 Broadway, Suite 1300, Denver, CO 80202

Defendant Cheryl Hara is a citizen of the United States who is the former Program Director of the Colorado Medical Board. Her former work address is 1560 Broadway, Suite 1300 Denver, CO 80202-5146. Hara is an attorney licensed to practice law in the Colorado.

The alleged wrongdoing and unlawful acts are personal to Defendants and not the Colorado Medical Board.

## BACKGROUND

Plaintiff is a highly trained radiation oncologist who graduated from the University of Washington's Medical School with Honor's Thesis and completed his residency from the prestigious University of Chicago Cancer Center. After residency, he received a highly prized radiation oncology research award that allowed him to pursue cancer research as a fellow at the University of Chicago from

June, l998 through May, 1999.  Even while immersing himself in basic science cancer research, Plaintiff achieved the distinction of being among the 25% of radiation oncologists who pass the radiation oncology board examination on the first attempt.  Though highly recruited out of residency and claiming the credentials for a promising career in academics, he became a partner in a radiation oncology practice in Pueblo, CO from June, 1999 to July, 2009. .

In August, 2002, Plaintiff began work at Rocky Mountain Cancer Centers in Colorado Springs. After one year, he became a partner and grew the radiation oncology by 150%.  Plaintiff's critics concede that he provided excellent patient care. There were no serious patient complaints filed against Plaintiff.  In fact, among physicians surveyed at RMC, Plaintiff achieved one of the highest patient satisfaction scores.

## FACTUAL HISTORY

In June of 1999, Plaintiff received a partner position at St. Mary Corwin Hospital in Pueblo, CO. Almost immediately, a radiation therapist romantically and aggressively pursued Plaintiff, who clearly stated he was not interested.  Consequently, the scorned therapist filed sexual harassment charges against him.  After a thorough investigation by the hospital network's attorney, Plaintiff was cleared of all wrongdoing.  Therapist then sought to have Plaintiff fired by alleging to Plaintiff's partners that he was harassing her and other workers.  Initially, Partners required Plaintiff be referred to the Colorado Physician Health Program ("CPHP") or be terminated.  Although Plaintiff complied with all demands, his partner's terminated him because "it was easier to replace a radiation oncologist than it was a radiation therapist."

On August 19, 2002, Plaintiff was hired by Rocky Mountain Cancer Centers ("RMCC ") to work at its radiation oncology department located in Colorado Springs.  During his employment, Plaintiff alleged to Supervisor and RMCC officers that his work environment was racially discriminatory and hostile.

*Referral to CPHP*

On August 8, 2005, Plaintiff's supervisor wrote Plaintiff a "Memo of Understanding" that alleged Plaintiff had caused:

> *difficulties center[ing] around disruptive behavior patterns that include but are not limited to, intense hurtful verbal criticism of others, disparaging remarks made to patients regarding physician colleagues, withdrawing and giving the cold shoulder to staff or colleagues.*

The Memo required Plaintiff to refer himself to CPHP as a condition of employment with RMCC:

> *We . . . feel that CPHP will be particularly crucial in resolving the issues described above We expect that you will sign appropriate paperwork and consent forms so CPHP may provide necessary reports and feedback. We are certain that if the process outlined above is not established that our chances of success are greatly diminished. Therefore it is imperative that the above three steps be taken for our partnership to continue.*

On September 8, 2005, Plaintiff met with CPHP Associate Medical Director, who performed a complete assessment, including a physical and mental examination. On the second visit, Medical Director questioned Plaintiff why he was referred to CPHP. On the third visit on or around November, 2005, Medical Director stated Plaintiff had no reason to be referred to CPHP, discharged him from further follow ups, and advised Plaintiff to find an employment lawyer.

*Employment Termination and Title VII Complaint*

Plaintiff complied with all new terms and conditions of the memorandum of Understanding. However, on February 6, 2006, the managing partner of RMCC demanded, without cause, notice, or opportunity to respond, Plaintiff's resignation.

After termination of employment, Plaintiff filed a complaint to the Equal Employment Opportunity Commission (EEOC) on or around May of 2006. On April 4, 2007, Plaintiff and RMCC received a Right-to-Sue Notice. On June 13, 2007, Plaintiff filed a Title VII Complaint against his former employer. (Civil Action No. 07-CV-01479).

*CPHP Recommends Course for Physicians Who Have Violated Sexual Boundaries*

Around two months after Plaintiff filed the EEOC complaint against former employer, CPHP contacted Plaintiff nine months after he was discharged by CPHP's medical director. CPHP personnel

recommended Plaintiff take a Vanderbilt University course entitled Maintaining Proper Boundaries. The

Course examined:

> • *Understanding sexual boundary issues and promotion of prevention detection and treatment of sexual addiction*
>
> • *Discussion of healthy sexuality and appropriate boundaries among staff colleagues and patients*
>
> • *Identification of risk factors in the education and training of physicians who have violated sexual boundaries*
>
> • *Identify family of origin issues and core personality factors that may contribute to sexual boundary violations*
>
> • *Review office organization and policies that establish non-sexual and sexual boundaries*

Neither RMCC nor Plaintiff's patients had accused him of violating patient sexual boundaries. Plaintiff

rejected CPHP's recommendation. On March 12, 2007, CPHP threatened Plaintiff that failure to comply

with recommendation would cause CPHP to report Plaintiff to the Colorado Medical Board:

> *In situations like this, where we cannot adequately monitor someone and an issue or question has been raised about potential practice safety, CPHP's role is to determine if that person's situation needs to come to the attention of the Colorado Board of Medical Examiners (BME). CPHP has an internal process whereby we present those cases anonymously to our Executive Committee (EC) of CPHP's Board of Directors to determine if we have a responsibility to report a physician to the BME, If you choose not to follow up with CPHP by telephone by March 16, 2007 to schedule an appointment and do not send confirmation of completion of the boundaries course, our clinical team will present your case to our EC on March 20, 2007.*

Again, on March 22, 2007, CPHP threatened Plaintiff that he either take the boundaries class or

face being reported to CMB:

> *The EC has recommended to CPHP that you need to comply with completion of, and confirmation to CPHP of completion of the boundaries course that was formerly recommended you. You must confirm completion of this by March 30, 2007 or CPHP is to report your case to the BME.*

### *CPHP Files Complaint with CMB*

On June 5, 2007, CMB Complaint Enforcement Specialist issued Plaintiff an informal letter of

complaint.in which CPHP alleged Plaintiff had (1) behavior problems with staff and patients, (2)

professional boundaries issues with staff, (3) a mood disorder, (4) failed to continue treatment with psychiatrist, (5) failed to attend formal professional boundary course, (6) failed to maintain contract with CPHP. The complaint requested Plaintiff respond to "whether or not you have any physical or mental disability which may affect your ability to practice medicine safely." The letter stated Plaintiff was allowed 30 days to respond to Notice of Complaint.

Also on June 5, 2007, Hara—CMB's program director—signed and issued an order pursuant to § 118(9)(a) that there was probable cause to believe that Plaintiff had failed to notify the board about "a physical or mental illness or condition that impacts the licensee's ability to perform a medical service with reasonable skill and with safety to patients." Section 118(9)(a) states:

> If the board has reasonable cause to believe that a licensee is unable to practice
> medicine with reasonable skill and safety . . .it may require such licensee to submit to
> mental or physical examinations by physicians designated by the board. If a licensee
> fails to submit to such mental or physical examination, the board may suspend the license
> until the required examination are conducted.

The § 118(9)(a) order required Plaintiff to:

*(1)  Immediately schedule an appointment with CPHP by June 19, 2007,*

*(2)  Appear for all appointments with CPHP, provide any information requested by CPHP, and cooperate fully with CPHP;*

*(3)  Fully cooperate with CPHP in a timely manner and comply with any and all requests or recommendation deemed appropriate, and*

*(4)  Facilitate any and all examinations necessary to determine if Plaintiff is able to practice medicine with reasonable skill and safety to patients.*

The following day, June 6, 2007, Hara signed and sent Plaintiff a letter that he must contact CPHP by June 19, 2007. The letter further stated that Plaintiff must bring all records of any psychiatric evaluation or medical assessment of yourself conducted any time in the preceding five year.

*Hara Suspends Medical License and Reports Suspension to the National Practitioner Data Bank (NPDB)*

On June 28, 2007, the program director signed and issued the order of suspension of Plaintiff's medical license. The order stated that there was reasonable cause to believe that Plaintiff was unable to

7

practice with reasonable skill and safety. Finally, the order stated that Plaintiff was suspended from practice of medicine until he complied with the order to "fully cooperate with CPHP in a timely manner and comply with any and all requests or recommendation deemed appropriate."

Also on June 28, 2007, Hara or co-conspirators filed a report with the NPDB that Plaintiff's medical license was suspended. The basis of the action was "violation of or failure to comply with licensing board order." *Id.* The NPDB report stated that the adverse action was *not* "based on the professional competence or conduct, which adversely affected or could have adversely affected the health or welfare of the patient."

On August 17, 2007, the full board meeting failed to disclose information about Plaintiff's medical suspension as required under CMB policy.

On October 4, 2007, the Illinois Dept. of Financial and Professional Regulations denied Plaintiff's renewal of his Illinois license because of CMB's disciplinary action

## Denial of Post-Suspension Hearing

On November 19, 2007, Plaintiff complained to Hara about the absence of due process in suspending his medical license. The nine page complaint raised errors about the suspension order and requested a hearing.

### Exhaustion of State Remedies—Attorney General's Office

On December 10, 2007, Plaintiff called the Attorney General's Office ("AGO") and was referred to a lawyer named Claudia. After Plaintiff informed Claudia of the CBME case number, she stated that the AGO had no record of his case. Claudia requested Plaintiff recount the facts and events leading to his medical license suspension to a second AAG. The AAG responded:

(1)     Since the medical board and Hara were both represented by AGO, Plaintiff could not file a complaint in the AGO forum.

(2)     AAG would inform Hara of their conversation with Plaintiff.

(3)     Since the matter had not been referred to their office, AAGs would not initiate an investigation or hearing regarding Plaintiff's license suspension.

(4)    Plaintiff would not receive any assistance or support from AAG in the future.

Four days after AAG stated they would inform Hara of Plaintiff's complaint, on December 14, 2007, Hara issued a second order for Plaintiff to undergo an evaluation by CPHP. On January 10, 2008, a second suspension order was issued and reported to the NPDB. On January 25, 2008, Hara reported that the suspension was based on Plaintiff's professional competence or conduct which adversely affected, or could have adversely affected the health or welfare of the patient.

*Exhaustion of State Remedies—Administrative Law Courts*

In the afternoon of December 10, 2007, Plaintiff communicated with a Richard Walker of the Office of Administrative Law Courts of Colorado to request a hearing regarding the medical license suspension. Mr. Walker asserted:

(1)    Plaintiff could not set up a hearing with the Administrative Courts but the AGO could do so.

(2)    Since Plaintiff's case had not involved the AGO, Plaintiff could not ask an administrative law judge to adjudicate the matter, even though the Medical Practice Act ("MPA") and Administrative Procedures Act ("APA") required appeals be made through this process.

(3)    Plaintiff did not have an avenue of redress in the Colorado Administrative Law Courts.

*Appeal to Hara's Supervisors*

On January 14, 2008, Plaintiff wrote letters to Hara's first level and second level supervisors. The letter provided:

(1)    CMB case number and background of the case;

(2)    Examples of ways Hara deprived Plaintiff of procedural due process and other constitutional rights;

(3)    A plea for Supervisors to do the right thing, investigate, and take appropriate steps to remedy the injustice served on Plaintiff;

(4)    If Supervisors failed to respond to Plaintiff's letter, he could only conclude that Supervisors supported and/or condoned Hara's misconduct.

Supervisors failed to respond to Plaintiff's letter and took no action regarding the two suspension of Plaintiff's medical license.

Medical Board Informed of Suspension and Lawsuit

On February 21, 2008, the Board was informed of "a lawsuit in federal court involving as Paul Mitchell, M.D." In the August 21, 2008, "the Board reviewed with the board "privileged case status reports dated August 5, 2008, and confidential memorandum privileged attorney-client communications from Sue Kim, AAG, dated August 4, 2008, and attachment, regarding a lawsuit by Paul Mitchell, M.D. No action was taken."

*Federal Complaints Dismissed without Prejudice Prior to Commencement of Action*

On January 9, 2008, Plaintiff filed a § 1983 claim for substantive and procedural due process violations in the medical license suspension.   The complaint was subsequently sua sponte dismissed without prejudice before the case was commenced.  On June 6, 2008, Plaintiff filed a second § 1983 claim.  Again, the complaint was sua sponte dismissed without prejudice before the case was commenced.

*State Complaint Dismissed*

On July 7, 2009, Plaintiff filed a complaint in state court alleging constitutional violations pursuant to § 1983 and advancing various other state claims based on events prior, during, and after the suspension of his medical license.  The defendants in the action are Hara and CPHP.  On January 10, 2010, the state court ordered that Plaintiff's motion to proceed in forma pauperis be stricken and claims dismissed with prejudice pursuant to CRS 13-16-102 and *Hytken v. Wake,* 68 P.3d 508 (Colo. App. 2002)

On appeal, the Court of Appeal held:

(1) *The federal claims Mitchell asserts here are barred by res judicata.  Mitchell had an opportunity to fully litigate those claims in federal court.  A final judgment was entered on Mitchell's claims for relief, based on alleged violations of § 1983, in favor of the defendants.  We conclude Mitchell's federal claims are barred in this state court proceeding.*

(2) *Our review of the record does not reveal why the trail court dismissed Mitchell's state claims. . . . The lack of findings in the order of dismissal hampers our ability to review the basis for the trial court's dismissal of the state law claim.  We therefore remand that part*

10

*of the trial court to dismiss the state claims with prejudice and to make further findings consistent with this opinion.*

On remand, the district court was directed to (1) state the basis for the dismissal of state law claims and (2) provide a short period of time" to file the $25,000 cost bond.  On November 8, 2011, after Plaintiff was unable to post the cost bond, the state court dismissed state law claims.

On May 19, 2011, Plaintiff petitioned Colorado Supreme Court for Writ of Certiorari.  On July 5, 2011, the Supreme Court denied the petition.

*Compliance with CPHP Required to Lift Suspension*

On August 18, 2014, Plaintiff e-mailed the current program director of CMB—McGovern—to determine what must he do to have the suspension removed.  The following day, the attorney for CMB responded: "I'm not able to remove that suspension.  When someone suspended allows their license to expire, we can't just remove it.  You can reengage with CPHP and have them send a letter to us that you are compliant."

On August 21, 2014, Plaintiff e-mailed the AAG who defended Hara in the federal and state complaints requesting the AAG resolve the matter without the court's involvement.  The AAG neglected to respond but forwarded the e-mail to McGovern.

On August 28, 2014, CMB attorney reiterated to Plaintiff that the suspension could only be relieved by compliance with the CPHP order even though Plaintiff now lived in North Carolina.

On September 4, 2014, McGovern e-mailed Plaintiff:

> *The Board will not lift the suspension of your license to practice medicine in the state of Colorado until such time as you provide the Board with documentation establishing you are in full compliance with the Board Order of December 14, 2007.*

The following day, Plaintiff responded to McGovern:

> *I don't know if you can possibly imagine the suffering that I experienced as a result of having my medical license suspended . . . . You know what happened to me.  You cannot allow this injustice to continue.*

Also that day, Plaintiff sent his petition for reconsideration of the summary suspension directly to the medical board.  However, on September 8, 2014, McGovern intercepted the petition and e-mailed

11

Plaintiff: "I am in receipt of your petition.  Please direct all future correspondence with the Board and or Board staff to me."

## CPHP's Failure to Release Records

On August 26, 2014, Plaintiff called CPHP director, who refused to take his call.  Later that day, CPHP director informed Plaintiff that in order for them send a letter of compliance to CMB, he would have to meet all CPHP's terms and conditions, including attending boundaries course for violation of patient sexual boundaries.  Plaintiff responded that he lived in North Carolina and could not afford to return to Colorado for an evaluation or afford the $5,000 course.  Also, Plaintiff suggested that his records be transferred to the North Carolina Physicians Health Program ("NCPHP").  CPHP director would not agree to that option.

On August 27, 2014, Plaintiff signed a release of information waiver for records to be sent to NCPHP.  On September 10, 2014, NCPHP stated that they had not received the records from CPHP.

## Supporting Evidence of Fitness to Practice Medicine

In or around August, Plaintiff received a letter of recommendation for applying to psychiatry residency.  The recommendation stated that:

   (1)  Plaintiff is believed to be a caring, intellectual physician;

   (2)  Plaintiff would clearly be a phenomenal asset to your residency program; and

   (3)  Residency program will be pleased with Plaintiff's work and personality.

Also, a doctor in education wrote Plaintiff a character reference that concluded:  "After knowing Dr. Mitchell for four years, I believe he will make every effort to meet and exceed expectation in the residency program."

## Conversation with North Carolina Medical Board

On August 28, 2014, Plaintiff discussed reentry into medicine with the North Carolina Medical Board ("NCMB") officer, who stated that NCMB would require the license suspension be removed to be

considered for a provisional North Carolina medical license. NCMB personnel informed Plaintiff that he would be required to take tests to demonstrate competency in medicine and the reentry process would take at least six months. But the first step must be the lifting of the medical license suspension.

*Medical Suspension Concealed from Colorado Medical Board*

August 21, 2014, AAG forwarded Plaintiff's e-mail requesting parties resolve the license suspension without court involvement to McGovern. On September 4, 2014, McGovern rejected Plaintiff's offer and stated that the board will not lift the suspension until he complied with Hara's order. On September 5, 20914, Plaintiff e-mailed the Petition to CMB for presentation to the board. On September 8, 2014, McGovern e-mailed Plaintiff that she had intercepted the petition and all documents related to the petition should be directed to her.

On September 9, 2014, Plaintiff informed the chair of the medical board his concerns about his petition being buried or concealed from the board by McGovern. Later that day, Board personnel e-mailed Plaintiff that she had received the petition.

> BOARD PERSONNEL: Wanted to let you know that I received your petition.
> PLAINTIFF: Is there any chance that Ms. McGovern will bury it so the Inquiry Panel won't see it?
> BOARD PERSONNEL: I'm not sure if your [sic] asking if this won't make it to the Panel? The answer is that it will make it to the Panel.
> PLAINTIFF: Thanks. I just need some reassurance after 8 years of trying and failing.
> BOARD PERSONNEL: No problem.
> PLAINTIFF: I've included a supplement to my petition because of the last second developments that occurred. Also, I'm not confident that McGovern sent you the updated petition, so please compare the one I included with the one she sent you.
> BOARD PERSONNEL: Thank you

On September 16 and 17, 2014, the following communications occurred:

> PLAINTIFF: I would like to apply to residency programs for the 2015 match. I was wondering when I might hear word about my suspension. Any information would be greatly appreciated.
> PLAINTIFF: I received the e-mail below this morning. It effectively states that to be a candidate in the 2015 residency match my ERAS application should be submitted tonight. However, submitting my ERAS makes no sense if my medical license is suspended. This is a critical crossroad for me. My best shot of returning to medicine is through the residency match program.
> I am pleading for my suspension to be lifted pending a hearing so I can apply to residency match program. Regardless of what the board decides, please inform me today so I am not left in limbo.

BOARD PERSONNEL TO MCGOVERN:  [Forwarded email] I haven't responded.
MCGOVERN TO PLAINTIFF:  Your petition will be reviewed in October, Your submission did
not meet the September agenda deadline.

*Petition Denied*

On October 15, 2014, McGovern signed and issued a letter that denied the petition:

*On October 9, 2014, Inquiry Panel A, of the Colorado Medical Board, reviewed your
Request for Reconsideration of the Summary Suspension.  After due consideration, the
Panel denied your request.  As expressly set forth in the Order of Suspension dated
December 14, 2007, the suspension of your license to practice medicine in the state of
Colorado will remain in effect until such time as you provide documentation establishing
full compliance with Board Order.*

# VI.    § 1981 CLAIMS

42 U.S. Code § 1981(a) maintains:

*All persons within the jurisdiction of the United States shall have the same right
in every State and Territory to make and enforce contracts, to sue, be parties, give
evidence, and to the full and equal benefit of all laws and proceedings for the
security of persons and property as is enjoyed by white citizens, and shall be
subject to like punishment, pains, penalties, taxes, licenses, and exactions of every
kind, and to no other.*

Section 1981(b) defines "make and enforce contracts" to include "the making, performance, modification,

and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the

contractual relationship." Part c provides that the protection of parts a and b apply to private and

governmental discrimination and impairment.

Section 1981 is derived from § 2 of the Thirteenth Amendment. *General Building Contractors*

*Assn., Inc. v. Pennsylvania,* 458 U. S. 372, 390 n. 17 (1982) ("[Section] 1981, because it is

derived in part from the 1866 Act, has roots in the Thirteenth as well as the Fourteenth

Amendment"). *See also Jones v. Alfred H. Mayer Co.,* 392 U. S. 409, 440-443, n. 78 (1968)

14

A.      **Making and Enforcing Contract with CMB**

Thus, the Equal Protection Clause of the 14th amendment of the U.S. Constitution prohibits states from denying any person within its jurisdiction the equal protection of the laws. *See* U.S. Const. amend. XIV.    This complaint alleges that Defendants, acting under the color of state law, treated Plaintiff in a different manner than other licensees in similar conditions and circumstances because of his race.

*Contract between licensee and CMB*

42 U.S. Code § 1981 provides that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." Under § 1981(b),  " 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

Defendants are alleged to have deprived Plaintiff of membership rights because of his race.  Plaintiff entered into a contractual relationship with CMB.  Under the contractual relationship, the CMB received membership fees and Plaintiff received a Colorado medical license.  The CMB claims that it does not discriminate on the basis of race.

Defendants are alleged to have modified the contract. Under the contract, "all proceedings shall be expeditiously and informally conducted so that no licensee is subjected to unfair and unjust charges and that no complainant is deprived of his or her right to a timely, fair, and proper investigation of his or her complaint.  § 12-36-118(4)(d).  There is substantial evidence that Defendants unlawfully modified Plaintiff's contract.  Evidence supports Plaintiff was denied a timely, fair, and proper investigation when they disciplined him before issuing the 30 day notice.  The § 118(9)(a) order was decided on May 16, 2007.  The 30 day notice was issued on June 5, 2007.  Therefore, an investigation by which "the Panel found it has reasonable cause to believe" that Plaintiff was unable to practice medicine safety and reasonable skill was

15

not a timely, fair, or proper investigation. Moreover, charges were brought against Plaintiff without a shred of evidence. Consequently, Plaintiff was subjected to unjust and unfair charges. In sum, the supporting evidence provides that Defendant modified the contractual relationship.

Defendants are alleged to have terminated the contract with Plaintiff. Defendants have effectively revoked Plaintiff's license and thus breached the contractual relationship. Hara issued a suspension of the medical license for an indefinite period on June 28, 2007. Plaintiff has unsuccessfully attempted for nearly eight years to have the suspension lifted. On August 18, 2014, Plaintiff requested to have a hearing on the suspension but was denied by McGovern. Thus, Plaintiff's license was revoked and the contract breached.

Defendants are alleged to have deprived Plaintiff of the benefits, privileges, terms, and conditions of the contractual relationship. The benefits of the contract allowed Plaintiff to make his livelihood by practicing of medicine and supporting his family. However, as a direct and proximate result of the medical suspension Plaintiff is unable to provide support for himself, much more his family. The privilege of the contract allowed Plaintiff to apply to other states to practice medicine. However, Plaintiff is denied this opportunity as a result of revocation of his license. The terms and conditions of the medical license stated that if Plaintiff did not breach the contract for cause such as professional misconduct and paid his medical license fees, the contract would be renewed. Plaintiff complied with all the terms and conditions of the contract, yet Defendants allegedly breached the contract without cause.

Defendants are alleged to have breached the contract with Plaintiff because his is Black. As described in the background of this complaint, Plaintiff is a highly trained and highly qualified board certified radiation oncologist. During Plaintiff's 18 years of medical school, residency, and private practice, he has never been disciplined for any cause. He further

maintains that his separation from his initial position was strictly political.  He also maintains and filed a Title VII lawsuit that his second employer terminated him for racially motivated reasons.  This RMCC has stated in their EEOC position statement that Plaintiff was not terminated because of his medical competency or patient care skills.  On August 16, 2004, an Emotional Competency Inventory that conducted by his RMCC was reported.  Plaintiff's manager wrote: "Very good clinical skills and knowledge of radiation oncology as well as medicine.  Excellent rapport with patients and referring physicians."  Therefore, the preponderance, if not all evidence, supports the conclusion that Plaintiff was able to practice medicine with reasonable skill and safely, and he did not breach the contractual relationship.

After seven years, Defendants have failed to provide pretext or a legitimate nondiscriminatory reason for claiming that Plaintiff was unable to practice medicine with reasonable skill and safety.  Defendants have had opportunity to provide evidence to the inquiry panel, the hearing panel, and in civil courts but have refused to do so.  Upon belief and information, Defendants have not treated similarly situated White licensees in the same manner they treated Plaintiff.

Thus, under the McDonnell model, Plaintiff has indirectly established a discriminatory animus by Defendants.  Plaintiff has provided and can provide more evidence that he was able to practice medicine with reasonable skill and safety and did not breach the contract.  Defendants have failed to articulate grounds or pretext that Plaintiff had breached the contract.  Therefore, the inference must be raised that the Defendant's breach of the contract was a result of racial animus against Plaintiff.

**B.      Interference with Making and Enforcing Contract with RMCC**

Defendants are alleged to have conspired to interfere with the contract between former employer, RMCC and Plaintiff.  Defendants are alleged to have provided pretext for RMCC

claim that plaintiff was terminated based on his inability to practice medicine with reasonable skill and safety.

On February 6, 2006, Plaintiff and RMCC had an employment agreement which was terminated.    RMCC claimed to the EEOC and in federal and state court, among other things, that Plaintiff was terminated for cause.  Plaintiff claimed he was terminated because of his race. RMCC, in order to support termination of the contract for cause, allegedly turned to CPHP to manufacture cause for terminating Plaintiff.  In turn, CPHP turned to Defendants to issue an order that Plaintiff was unable to practice medicine with reasonable skill and safety.  Thus Defendants are alleged to have conspired with RMCC to change the benefits, privileges, terms, and condition of the contract between RMCC and Plaintiff.

There is ample evidence to support Defendants effects on the RMCC/ Plaintiff contractual relationship.  The 30 day notice letter written on June 5, 2007 explicitly states: "Documentation received [by CMB] indicates that you were referred to the Colorado Physician Health Program (CPHP) by your employer due to . . . ." Also the June 6, 2007 letter and § 118(9)(a) order was also issued specifically to the executive director of CPHP.  On June 20, 2007, CPHP notified Hara that Plaintiff had not complied with the June order.  On June 28, Hara issued the suspension order without any mention of the inquiry panel's involvement.

Additional evidence of a meeting of the minds and object to be accomplished occurred on December 14, 2007, January 2, 2008, and January 10, 2008.  A copy of the second § 118(9)(a) order was sent to the executive director of CPHP who communicated to Hara that Plaintiff had not complied with the order.  Consequently, Hara issued a second suspension of Plaintiff's medical license.

Therefore, evidence of a causal nexus exists between RMCC's objective to create pretext that Plaintiff was terminated for his inability to practice medicine with reasonable skill and safety and Hara's issuance of a suspension to that effect. All of which, Plaintiff alleges, was triggered because of discrimination based on Plaintiff's race resulting in the termination of his employment contract and retaliation for Plaintiff filing a Title VII lawsuit against RMCC.

## C.     Making and Enforcing Contract with Others

Section 1981 prohibits racial discrimination in the making, performance, modification, and termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. *See Reynolds v. School Distr. No. 1, Denver, Colo.* 69 F.3d 1523 1532 (10th Cir. 1995).

### 1.     State Medical Licensing agencies and Residency Programs

Defendants are alleged to have deprived Plaintiff of contract interests with medical licensing agencies in violation of § 1981 because of racial animus. There is evidence to plausibly demonstrate that Plaintiff has suffered actual contract interest loss as a result of alleged misconduct.

As described in the factual history, the State of Illinois denied Plaintiff renewal of his medical license as a direct and proximate of Hara's summary suspensions. The State of Indiana denied Plaintiff the right to continue practicing medicine as a direct and proximate result of Hara's summary suspensions. In September of 2014, Plaintiff was denied access to the Residency Match Program as a direct and proximate cause of Hara's summary suspensions. From the preceding evidence, a reasonable person would plausibly believe that Defendants deprived Plaintiff of actual loss of a contract interest.

### 2.     Prospective Employers

Defendants are alleged to have deprived Plaintiff of actual contract interest in employment as a result of the summary suspensions. After June 28, 2007, Plaintiff engaged in seeking employment with temporary agencies and prospective employers. However, numerous agencies and prospective refused to engage in a contractual employment relationship because of the summary suspensions on Plaintiff's NPDB record. A person, identifying documents of rejected applications of a highly qualified applicant, would plausibly believe that the summary suspensions resulted in the actual loss of contract interests among prospective employers and temporary agencies.

**D.      Interference with CPHP Confidentiality Contract**

Hara is alleged to have to have interfered with the contractual confidentiality relationship between CPHP and Defendant. There is substantial evidence to support this conclusion and that Hara allegedly interfered because of Plaintiff's race.

As described in the factual history, Plaintiff signed a confidentiality agreement with CPHP in August of 2005. Plaintiff was discharged from CPHP in November of 2005. The contract agreement states:

> *CPHP shall not have a duty to report unless you meet one of the situations listed below:*
>
> *(1) A determination by CPHP clinical staff that you may present a danger to yourself or others; or that you may present a significant risk in your medical practice;*
>
> *(2) A determination by CPHP clinical staff that you have failed to comply with the terms of your treatment/monitoring program and that in the opinion of CPHP clinical staff you may present a danger to yourself, others or your medical practice;*
>
> *(3) A determination by CPHP clinical staff that an obligation to report exists based on violation of one or more provisions of the Colorado Medical Practice Act(CRS § 12-36-117 Unprofessional Conduct) in which harm to a patient may have occurred.*
>
> *(4) Pursuant to subpoena issued by BME.*

There is substantial evidence that Hara violated the confidentiality contract when issuing the § 118(9)(a) and suspension orders on June 6, 2007 and June 28, 2007, respectively, and, again on

December 14, 2007and January 10, 2008, respectively. First, Plaintiff was not evaluated by CPHP clinical staff after his initial evaluation in August of 2005. Based on this fact, CPHP clinical staff could not have drawn the conclusion that Plaintiff presented a danger to others or himself and posed a significant risk in his medical practice. Second, CPHP clinical staff discharged Plaintiff from CPHP in November, 2015. Consequently, Plaintiff was not on any treatment/monitoring program. Therefore, clinical staff could not have concluded that plaintiff had failed to comply with terms of the treatment/monitoring program and Plaintiff presented a danger to self, others, or his medical practice.

Third, clinical staff could not have claimed that Plaintiff had violated unprofessional conduct in which harm to a patient may have occurred for the following reasons: (1) CPHP clinical staff last evaluated Plaintiff in August 2005 and had discharged him from CPHP—two years before CPHP filed their charge with CMB; (2) Plaintiff had not practiced medicine in Colorado since his termination from RMCC in February, 2006—at least 18 months earlier; and (3) Plaintiff was never diagnosed with a mood disorder by CPHP or any other physician.

Hara had no probable cause to intentionally interfere with the confidentiality agreement. CPHP clinical staff had not reported to Hara any conditions of the contract that would allow Hara to publish private and personal information. There is absolutely no evidence that Plaintiff demonstrated any of the necessary conditions. Also, upon belief and information, Hara does not flagrantly interfere with confidentiality agreements among White licensees. Therefore, a person, knowing the totality of circumstances and facts concerning the flagrant violation of the confidentiality contract, could reasonably believe that she was motivated by a racial animus against Plaintiff in violation of the Thirteenth Amendment.

E.    **Full and Equal Benefit of All Laws and Proceedings for the Security of Property**

Defendants are alleged to have violated § 1981 when they deprived Plaintiff of full and equal benefit of all laws and proceedings for the security of his medical license as a result of his race. Section 1981 states: "All persons . . . shall the same right in every State . . . to the full and equal benefit of all

laws and proceedings for the security of person and property as is enjoyed by white citizens." Plaintiff's property is his medical license, which he secured lawfully and rightfully, yet allegedly was unlawfully taken from him. Plaintiff was denied full and equal benefit of the MPA and the APA, and Constitutional and federal laws intended for such allegations. Defendants are alleged to have deprived and continue to deprive Plaintiff of his medical license because of racial animosity and because he filed a Title VII lawsuit against RMCC. Evidence will be developed that similarly situated White licensees are not deprived of full and equal benefit of laws and proceedings as Plaintiff was.

There is evidence that Defendants have denied Plaintiff full and equal benefits of a formal hearing by the medical board in violation of C.R.S. § 12-36-118(5) and § 24-4-105. Also, there is sufficient evidence that Defendants deprive Plaintiff of rights to full and equal benefit of federal and state laws in federal and state proceedings. In federal court, Defendants are alleged to have influenced magistrate judges to dismiss or bury three complaints in violation of § 1915 and Federal Rules of Civil Procedure. In state court, Hara orchestrated Plaintiff to post a cost bond of $25,000 as an indigent. When unable to pay the cost bond, Hara ex parte communications influenced the court to dismiss the complaint with prejudice. Accordingly, Plaintiff was deprived benefit of the law and proceedings as a White citizen in violation of the Thirteenth Amendment.

F.     **Unlike Punishment**

Section 1981 provides that non-whites "shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and no other" than "is enjoyed by white citizens." Defendants are alleged to have violated § 1981 when they caused Plaintiff's license to be indefinitely suspended and reported and remain indefinitely suspended and reported. First, Defendants lacked the jurisdiction to dish out and enforce punishment. Second, Defendants clearly violated multiple statutes of the MPA and APA when delivering and maintaining punishment. Third, Plaintiff have not acted outside of their authority and violate statutes to issue invidious punishment against White licensees. Therefore, a person, knowing the totality of the

22

laws, facts and circumstances in disciplining licensees, could plausibly believe that Defendants' unequal adverse actions taken against a Black licensee were motivated by a racial animus in violation of the Thirteenth Amendment.

## VII.   SECTION 1983 CAUSES OF ACTION

**A.   PROPERTY INTERESTS VIOLATION**

**1.      Property Interest in Suspended License**

Plaintiff claims a property interest right in his medical license.  The Tenth Circuit has recognized suspension of a medical license as a loss property interest.  *See Horowitz v. Col. Med. Board of Examiners.*  Plaintiff has a legitimate claim to entitlement to his medical license.  Defendants, under color of state law, are alleged to have deprived Plaintiff of this constitutionally protected property.

**2.      Lack of Pre-Suspension Due Process**

**a.      Absent MPA and Medical Board Due Process**

*Time to Respond to Filed CMB Complaint*

Hara is alleged to have deprived Plaintiff of due process responding to a CMB charge filed by CPHP.  Under the MPA, "the licensee complained about shall be given notice by first-class mail of the nature of the complaint and shall be given 30 days to answer or explain in writing the matters described in such complaint."  § 12-36-118(4)(a)(1).  On June 5, 2007, CMB Complaint Enforcement Specialist issued the 30 day notice of complaint against Plaintiff.  According to MPA statute, Plaintiff would be given until July 5, 2007 to answer the complaint.  However, on the day the complaint was issued—June 5, 2007— Hara issued a § 118(9)(a) order.  On June 28, 2007, Hara issued the suspension order.  All orders were issued *before* the 30 day notice had expired.  From the preceding evidence, there is substantial support that Hara deprived Plaintiff of due process to respond to a complaint in violation of MPA statute.

*Due Process Failure in Issuing § 118(9)(a) order*

Hara is alleged to have deprived Plaintiff of due process protections provided under the MPA. Licensees are promised an inquiry into a complaint "is expeditiously and informally conducted so that no licensee is subjected to unfair and unjust charges and that no complainant is deprived of his or her right to a timely, fair, and proper investigation of his or her complaint." § 12-36-118(d) (2009). In this instance, there is evidence that the complaint was formally conducted insofar as it was reported to the NPDB as formal disciplinary action. There is evidence that Plaintiff was subjected to alleged unfair and unjust charges. There is irrefutable evidence that there was no investigation. So whether the investigation was timely, fair, or proper investigation is irrelevant. In sum, the evidence demonstrates that Hara deprived plaintiff of due process guarantees under the MPA.

### Absent Due Process Deprivation in Filing Complaint

Issues of poor or questionable medical care are brought to the Board's attention by patients and their families, medical professionals, specialty societies, and other government and law enforcement agencies. *Complaints and Enforcement,* http//www.dora.state.co.us/medical/complaints.htm (2009). The Complaint was brought to the board by CPHP, who does not fall into any of usual sources of complaints. Moreover, the complaint did not accuse Plaintiff of poor or questionable medical care or any other unprofessional conduct charges defined under § 12-36-117.

Defendants could not have properly received a complaint from CPHP because it had never treated Plaintiff and was not a licensee. Although licensees have a duty to report to the board any licensee known, upon information and belief who have violated any of the provisions of § 12-36-117(l),"no licensee who is treating another licensee for a mental disability shall have a duty to report his or her patient unless, in the opinion of the treating licensee, the impaired licensee presents a danger to himself, herself, or others. § 12-36-118(3)(a). Yet, CMB's Complaint Enforcement Specialist, who addressed CPHP's complaint, requested Plaintiff to "advise the Board as to whether or not you have any physical or mental disability which may affect your ability to practice medicine safely." Therefore, Plaintiff was deprived of due process when he was requested to respond to a complaint of mental disability from CPHP.

*Absent Investigatory Due Process*

Hara is alleged to have deprived Plaintiff of investigatory due process. The According to information posted on CMB website, deprived Plaintiff An investigation may entail the Inquiry Panel (1) obtaining a copy of the pertinent medical or office records (2) requesting Division investigators to interview witnesses, or have cases reviewed by specialty experts. *Id.*

*Lack of Due Process in Inquiry Panel's findings*

Hara is alleged to have deprive Plaintiff of a due process investigation. According to MPA, a proper investigation may be made by one or more inquiry members, one or more licensees who are not members of the board, a member of the board, a profession investigator, or any other person or organization as the inquiry panel directs." §12-36-118(4)(a)(2)(II). The § 118(9)(a) order omits any mention of an investigation prior to issuing the order. Accordingly, Plaintiff was deprived of due process investigation under the MPA.

Also, Hara is alleged to have deprived Plaintiff of due process by the absence of findings of fact to support the § 118(9)(a) order. According medical board policy, the board has jurisdiction to take disciplinary action *only* if it ultimately finds that the licensee has violated the MPA. [*Id*]. Hara alleges in the § 118(9)(a) order that the panel "has reasonable cause to believe." However, the standard to find Plaintiff that had violated the statute could only be met by formal complaint filed by the AGO in administrative law courts and determination by hearing panel. § 12-36-118(4)(e) – (g). Since Hara does not allege formal proceedings, then due process was followed in the issuance of the § 118(9)(a) order.

*Failure to Provide Due Process for § 118(9)(a) order.*

Hara is alleged to have failed to provide Plaintiff with due process for § 118(9)(a) order. Under medial board policy number 10-06 (2006) , the board may issue a § 118(9)(a) order under two circumstances. The first circumstance is triggered when all of the following conditions are satisfied: (1) protection of the people of Colorado; (2) Grounds are provided in the order so that a reasonable person would believe that Plaintiff could not practice medicine safely; (3) Plaintiff is charged with drugs, alcohol, or domestic

violence crimes; and (4) Plaintiff has a physical and mental condition that prevents him from practicing medicine safely. The § 118(9)(a) order (l) lacked any mention about the protection of the public, (2) lacked grounds so that a person would believe could not practice medicine safely, (3) failed to report that Plaintiff had not been charged with drugs, alcohol, or domestic violence crimes, and finally, (4) the board had not found that Plaintiff had a physical and mental condition that prevented him from practicing medicine safely.

Alternatively, the second circumstances that may lead to a § 118(9)(a) order is when: (1) the order is intended to protect the people of Colorado; (2) Plaintiff self-reported a disability to CMB; and (3) the order to CPHP is for a mental or physical exam. There is evidence that the order was not intend to protect the public. Plaintiff did not have a disability to self-report to the CMB. However, Hara's § 118(9)(a) required Plaintiff to comply with much more than a CPHP mental and physical exam. From the due process procedures stated above, there is substantial evidence that Hara deprived Plaintiff of due process when issuing the § 118(9)(a) order under medical board policy.

3.    **Suspension Due Process Deprivations**

a.    **Absent Medical Practice Act Due Process**

*CMB Rule 280 Due Process*

Hara is alleged to have deprived Plaintiff of due process rights under Medical Board Rule 280 (2002), which "provides procedural safeguard for licensees whose licenses are to be suspended by an Inquiry Panel of the Board pursuant to §§12-36-118(9)(a), CRS, and 24-4-104(4), CRS." The safeguards are intended to be in addition to that provided by the MPA and the APA. The rules provide a licensee (1) an opportunity to appear before the Inquiry Panel prior to or after the ordering of a suspension, and (2) an opportunity to offer information or legal argument before or after the suspension. Hare failed to provide Plaintiff with an opportunity to appear before the inquiry panel. Also, Hara failed to allow Plaintiff an opportunity to offer information or legal argument. Also under Rule 280, a § 118(9)(a) suspension must show: (1) findings of reasonable cause, and (2) facts and circumstances supporting that finding. The

26

suspension order lacked both elements. Thus, there is evidence that supports the denial of due process rights pursuant to Rule 280.

Hara is alleged to have deprived Plaintiff of due process by the lack of a pre-suspension hearing. Pre-suspension notice and hearing is indicated under Plaintiff's circumstance. Plaintiff's Colorado medical license had already expired and he had not practiced medicine since February 6, 2006. Therefore, Plaintiff could not be a harm to the public. Emergency action of summary suspension was not appropriate under the conditions established Rule 280. Therefore, evidence supports that Plaintiff was deprived of a pre-suspension notice and hearing under medical board Rule 280.

### Due process for Disciplinary Actions

Hara is alleged to have deprived Plaintiff of MPA due process procedures for a disciplinary action. In cases where the Inquiry Panel is unable to resolve the complaint with the physician, the case is referred to the Attorney's General's Office for filing of a formal complaint with the Division of Administrative Hearings. During the hearing, evidence is presented and testimony of witnesses and experts is taken. A decision is rendered by an Administrative Law and the case is forwarded to a hearing panel of the Board. The Hearing Panel makes the final decision as to whether or not discipline is appropriate and the terms of the discipline. *See generally* § 12-36-119(5)(e) –(g) (2009). In this instance, Hara deprived Plaintiff of a formal complaint hearing in violation of MPA statute.

    b.    **Absent Administrative Procedures Act Due Process**

Lack of Pre-suspension Notice

Hara is alleged to have deprived Plaintiff of a pre-suspension notice and hearing in violation of the Administrative Practice Act (APA) A pre-suspension notice and hearing may only be waived after the following conditions are met: (1) "licensee is given a reasonable opportunity to comply with all lawful requirements," (2) there is objective and reasonable grounds to believe that the licensee has been guilty of deliberate and willful violations; (3) objective and reasonable grounds that licensee's conduct is a substantial danger to public health and safety; (4) the agency finds upon a full investigation that the

licensee has been guilty of deliberate and willful violation that could harm or has harmed the public

safety, and emergency action is required; (5) findings of the full investigation are incorporated in the

order; (6) scheduled proceedings for the suspension are promptly instituted and determined. *See* § 24-4-

104(3) and § 24-4-104(4)(a).

There is substantial evidence that the suspension order did not satisfy due process procedures to

avoid pre-suspension notice and hearing for the following reasons. First, the suspension order was

unlawful because § 12-36-118(9)(a) proscribes the inquiry panel or Hara from issuing an order under this

statute. The suspension order was unlawful also because Plaintiff had recently undergone a physical and

mental examination by CPHP. Therefore, even though the inquiry panel and Hara had a clear absence of

jurisdiction to issue the order, Plaintiff had already complied with the order.   Finally, the suspension

order was unlawful on the basis that § 118(9)(a) requires licensees to only undergo a physical and mental

examination by CPHP. However, § 118(9)(a) order required Plaintiff to perform much more than a

physical examination. For these reasons, the suspension of Plaintiff's license was based on an unlawful

order and cannot satisfy the first condition to avoid pre-suspension notice and hearing.

The other requirement to avoid pre-suspension notice and hearing were unmet. The second

condition was unsatisfied on the basis that the suspension order lacked objective and reasonable grounds

to believe that the licensee has been guilty of deliberate and willful violations. The suspension makes no

mention of "deliberate and willful violations." Much more, the suspension order fails to provide objective

and reasonable grounds to support deliberate and willful violations.

Third, the suspension order failed to provide objective and reasonable grounds that Plaintiff's

conduct is a substantial danger to public health and safety. The suspension order makes conclusory

assertion that the Plaintiff was unable to practice medicine safely to patients. However, the suspension

order any evidence whatsoever to support allegation.

Fourth, the suspension order provides substantial evidence that a full investigation of any sort

never happened. The suspension order lacks any evidence that Plaintiff was sent a 30-day notice, had

opportunity to respond to the notice, or that an investigation was performed. Therefore, the suspension

order cannot be supported by findings of fact and determination from an investigation. Moreover, Plaintiff had not released his medical information for the panel to review Plaintiff's mental and physical condition. Hara alleges that the inquiry panel found that Plaintiff was unable to practice medicine with reasonable skill and safety. However, Hara does not allege in the suspension order that the panel determined that Plaintiff engaged in deliberate and willful violations of professional conduct.

Finally, the suspension orders lacked provision for post-suspension notice and proceedings for the suspension. The APA requires there be a proceeding on the suspension. *See* § 24-4-104(5). The proceeding must be filed by a complainant stating the complaint and the grounds for the requested action. *Id.* A licensee cannot be suspended until after the hearing. § 24-4-104(6). Since Plaintiff did not have a hearing, Hara allegedly suspended him unlawfully. Also, Plaintiff was denied access to a hearing by Defendants.

In sum, Defendants failed to satisfy even one of the elements required to avoid due process of a pre-suspension notice and hearing under the APA. Accordingly, due process rights of medical license property interest are alleged to be deprived by Defendants under the color of state law in violation of the Fourteenth Amendment

**4.    Post-Suspension Due Process Deprivations**

  *a.    Absent Post-suspension Due Process under Medical Practice Act*

Hara is alleged to have deprived Plaintiff of post-suspension due process under medical board policy. Rule 280 provides MPA due process requirements for summary suspensions. In order to be compliant with Rule 280 post suspension notice and hearing, the suspension order was required to:

  *(1) provide notice of the suspension; and*

  *(2)  give notice of Plaintiff's ability to request a post-suspension hearing within 72 hours of the suspension and statements informing Plaintiff of: (a) nature of issues that led to suspension, (b) hearing before the Inquiry Panel at its next meeting, (c) written materials may be submitted in defense;*

There is substantial evidence that the suspension order failed to satisfy the due process prerequisites for a summary suspension. First, the suspensions orders failed to give Plaintiff notice of a post-suspension hearing. Second, the suspension orders failed to provide Plaintiff with the issues that led to suspension. The suspension order asserted that Plaintiff had a mental or physical condition. However, the suspension order lacked any evidence to support the claim nor did the inquiry have information to reach this information. These and other material issues were not addressed in the suspension order.

Third, Hara presented no information in the suspension order that Plaintiff had a right to appear before the inquiry panel at its next meeting. Finally, the suspension order provided no information that written materials may be presented in Plaintiff's defense. If Plaintiff was afforded a defense, he could have maintained that he had already complied with § 118(9)(a) order to undergo an physical and mental examination by CPHP. Although Plaintiff had declined to be subjected to other demands of the June and December orders, he was not required to follow alleged unlawful and unconstitutional demands added to the § 118(9)(a) order of a mental and physical examination. In sum, there is abundant evidence supporting the allegation that Hara deprived Plaintiff of post-suspension due process under the MPA.

In addition to CMB Rule 280, the medical board's policy is "when an immediate suspension of a practitioner's license has been imposed, the practitioner has the right to a formal hearing conducted by the Administrative Law Judge and the division of Administrative Hearings. *Complaints and Enforcement*, http://www.dora.state.co.us/medical complaint. Htm (2009). Thus, there is evidence that Hara deprived Plaintiff of post-suspension notice in violation of CMB's own policy.

### b.   Absent Post-Suspension Due Process under Administrative Procedures Act

Hara is alleged to have deprived Plaintiff of due process under the APA. For Hara to be shielded from a claim of violation of due process after a summary suspension of a state-issued license, the suspension order must show: (1) grounds so that a reasonable person would believe that a licensee could not practice medicine safely; (2) findings from the hearing of facts; (3) showing of licensee's deliberate and willful violation of statutory rules or public health, safety, or welfare concerns warranting emergency

action; (4) notice of pending proceedings at the time of summary suspension; and (5) promptly instituted and determined post-deprivation hearing.

Hara failed to satisfy any one of the elements of the APA when she summarily suspended Plaintiff's license. Hara neglected to identify the condition that resulted in Plaintiff unable to safely practice medicine. Hara merely asserted that there was information "describing" Plaintiff's mental/physical conditions. However, Hara failed to indicate how the alleged condition would allow a reasonable person to believe that Plaintiff was unable to practice medicine safely. Also, the suspension order lacked (1) findings of facts from the inquiry panel hearing, (2) evidence of Plaintiff's deliberate and willful violation of alleged statutory rules or public health, safety, or welfare concerns, (3) post-suspension notice, and (4) post-deprivation hearing.

From the facts stated above, there is substantial evidence that Hara deprived Plaintiff of post-suspension due process as defined under the APA.

## B.  LIBERTY INTERESTS DUE PROCESSS DEPRIVATIONS

Defendants are alleged to have deprived Plaintiff of liberty interests without due process  The liberty interest clause of the Fourteenth Amendment provides Plaintiff with the right to enjoy privileges essential to the orderly pursuit of happiness. One liberty is to be protected from official stigmatization and to obtain judicial relief for unjustified defamatory statements. In other words, "liberty" incudes the right to be free of official stigmatization or governmental action that impugns the individual's reputation, honor, and integrity and has a specific negative entitlement effect requires due process. Defendants are alleged to have damaged Plaintiff's good name and the loss of entitlements he should have received absent the alleged defamation. Defendants alleged reckless conduct was performed without due process, and, thereby, violated due process under the Fourteenth Amendment.

### 1.  Violation of Liberty Interests to National Practitioner Data Bank.

Hara is alleged to have violated Plaintiff's liberty interest in violation of the Fourteenth Amendment. On June 29, 2007, Hara reported the formal adverse action of Plaintiff's suspension to the National Practitioner Data Bank ("NPDB"). The basis for the action was discipline. On January 11,

2008, Hara reported to NPDB that Plaintiff was re-suspended and the reason for the action was "noncompliance pursuant to 12-36-118(9)(A) or failure to comply with licensing board order." The June 28 suspension reported that the adverse action was *not* based on "professional competence or conduct, which adversely affected or could have adversely affected the health or welfare of the patient." However, on January 25, 2008, Hara altered the June 28, 2007 report to read that Plaintiff's suspension was "based on professional competence or conduct which adversely affected or could have affected the health or welfare of the patient." Therefore, Hara made numerous false statements to NPDB that officially stigmatized Plaintiff.

Hara's alleged defamation has resulted in specific negative effects on Plaintiff's entitlement to rights, opportunities, benefits, and privileges he would normally have if Hara had not reported him to NPDB. For example, on October 4, 2007, the Illinois Department of Financial and Professional Regulation denied Plaintiff renewal of Plaintiff's Illinois license on the basis of the NPDB report of "license revocation, suspension or other disciplinary action taken by a federal, state or local licensing authority."

As another example, on January 18, 2008, the medical licensing board of Indiana received a board action disciplinary alert report from NPDB stating that CMB had taken the action of "summary/emergency/immediate/temporary suspension of medical license" against Plaintiff. The basis of the action was "failure to comply with board ordered physical/mental evaluation." On February 4, 2008, the medical licensing board filed a complaint with the Office of the Indiana attorney general. On February 20, 2008, Indiana deputy attorney general notified Plaintiff about complaint filed by Indiana licensing board and, if true, would prevent Plaintiff from practicing in Indiana. The Indiana AGO dismissed the complaint upon being informed that Plaintiff would not practice medicine in Indiana.

And yet another example, in August of 2014, Plaintiff began the process of applying to psychiatry residencies. The national residency match application requires residents submit an NPDB report. On September 16, 2014, Plaintiff sent medical board personnel an e-mail that reads:

*I would like to apply to residency program for the 2015 match.  I was wondering when I might hear word about my suspension.  Any information would be greatly appreciated.*

On September 17, 2014, Plaintiff sent board personnel another e-mail that reads:

*I received an e-mail from [Residency Match Program that] effectively states that to be a candidate in the 2015 residency match, my application should be submitted tonight.  However, submitting my application makes no sense if my medicine license is suspended.  This is a critical crossroads for me.  My best shot of returning to medicine is through the residency match program.*

*I am pleading for my suspension to be lifted pending a hearing so I can apply for the residency match program.  Regardless of what the board decides, please inform me today so I am not left in limbo*

In response, McGovern e-mailed Plaintiff the following:  "As I have previously explained, the plain language of the suspension order states that your suspension remains in effect until you complete the terms of the CPHP Order."

A fourth example of loss of entitlements arises when Hara alleged to the NPDB that Plaintiff's suspension is based on professional incompetence or which adversely affected the health and welfare of patients.  Under Section 1320a-7(C)(4), automatic disqualification from participation in federal medical programs results to "any individual or entity whose license to provide health care has been revoked or suspended by any State licensing authority . . . for reasons bearing on the individual's or entity's professional competence, professional performance, or financial integrity."  On January 25, 2008, Hara reported to NPDB that Plaintiff's license was suspended for professional performance.  Therefore, Hara's alleged official stigmatization prevents Plaintiff from participating in governmental reimbursement and compensation programs.  Additionally, Plaintiff cannot be employed by the Veterans Administration and other federal medical employers.

Defendants are alleged to have deprived Plaintiff from a right to be free from, and to obtain judicial relief from official stigmatization.  Moreover, Defendants have deprived Plaintiff of due process before stigmatizing Plaintiff to the NPDB. As described above, Defendants official defamation has caused loss of specific entitlements he would ordinarily receive but for alleged defamation to the NPDB.

Absent alleged defamatory statements, Plaintiff could have (1) renewed his Illinois medical license, (2) practiced in Indiana, (3) applied to the residency match program, (4) received federal medical reimbursement, (5) worked at the Veterans Administration.

Also, there is evidence that demonstrates Hara knowingly, willfully, and maliciously represented to NPDB that Plaintiff's suspension was the result of formal action. Government agencies must only report "final adverse action" taken against a health care provider. 42 U.S.C § 1320(b)(1). Final adverse action is defined as "formal or official action, such as revocation or suspension of a license, reprimand, censure, or probation." § 1320(g)(1). Hara is alleged to have reported information that was (1) non-final, (2) non-formal, (3) and could not be appealed.

Hara is alleged to have known that when she suspended Plaintiff, the invidious action could not be an informal nor a formal adverse action. The totality of the circumstances makes this conclusion irrefutable. Hara suspended Plaintiff's license prior to the informal inquiry phase of the investigation process. Section 12-36-118(4)(a)(I) provides that "upon receipt of the licensee's answer or the conclusion of thirty days . . . the inquiry panel may conduct a further investigation [that] shall be entirely informal." Since Hara issued the suspension order during the 30-day Notice, the suspension order was neither an informal nor a formal adverse action. Accordingly, Hara allegedly misrepresented facts to NPDB that deprived Plaintiff of property interests.

There is substantial evidence that Hara reported false statements she knew were incorrect to the National Practitioner Data Bank ("NPDB"). That Hara reported these alleged claims corruptly and maliciously. That Hara knowingly reported statements that tended to harm Plaintiff's reputation by lowering Plaintiff in at least a substantial and respectable number of prospective employers who routinely search the NPDB before hiring a physician. Hara's conduct was a substantial factor in causing (1) harm to Plaintiff's occupation, (2) expenses he had to pay as a result oft the defamatory statements, (3) harm to his reputation, (4) shame, mortification, and hurt feelings.

McGovern is alleged to have conspired with Hara. There is evidence that McGovern, knew that reports to NPDB were false but refused to correct them as required under the HCQIA. On August 21,

2014, Plaintiff e-mailed Hara's attorney who, in turn, forwarded it to McGovern. McGovern was informed that Plaintiff had previously filed defamation claims against Hara that was dismissed without prejudice. McGovern was also informed that Plaintiff could file another lawsuit or she could clear Plaintiff's name on the NPDB. McGovern implicitly decided for Plaintiff to file a lawsuit against her by asserting Plaintiff must comply with CPHP's demands in order to have the suspension lifted. Yet, even when informed of legal cause to pursue a defamation lawsuit, McGovern refused to make correction to the NPDB.

### 2.    Violation of Liberty Interest in Publication of the 118(9)(a) order

Hara is alleged to have falsely published statements that damaged Plaintiff's reputation in the 118(9)(a) order. Hara stated that Plaintiff "is unable to practice medicine with reasonable skill and safety to patients." As a result of this official stigmatization, Plaintiff's medical license was suspended. Thus, the alleged government official defamation and the lost of an entitlement brought into play the procedural requirements of the Due Process Clause. Hara's governmental action deprived Plaintiff of a right previously held under state law.

### 3.    Violation of Liberty Interest in Publication of § 118(9)(a) Suspension

Under the MPA, it is the policy of the medical board that orders of summary suspension are a matter of public record. *See* § 12-36-118(10) and CMB Policy No.: 10-18. Therefore, "all pleadings, initial decisions or orders, including any attachments, filed or created pursuant to the Medical Practice Act or the Administrative Procedures Act shall be open to public inspection."

Hara is alleged to have falsely reported statements that damaged Plaintiff's reputation in the suspension order. On June 28, 2007 Hara stated that Plaintiff (1) had failed to comply with a valid board order, and (2) was unable to practice with reasonable skill and safety to patients. As direct and proximate cause of the published § 118(9)(a) suspension, the government official stigmatized Plaintiff and removed an entitlement he had previously held under state law. On January 11, 2008 and January 25, 2008, after Plaintiff complained to the Attorney General's Office of the June 28, 2007 suspension, Hara is alleged to

have acted willfully and maliciously re-suspended Plaintiff license and report to NPDB that Plaintiff's alleged incompetence resulted in harm to patients.

Hara's published declaration that Plaintiff's suspension being caused by his inability to practice medicine safely resulted in more than irreparable harm to Plaintiff's reputation. Hara's statements caused specific negative entitlement effects. The suspension of the medical license prevented Plaintiff from practicing medicine in the state of Colorado. As a result, Plaintiff lost benefits and privileges of highly trained and educated physician. Plaintiff lost benefits of employment because he is unemployable without a medical license. Consequently, Plaintiff lost entitlement of his home, car, and the ability to provide for his family.

C. **EQUAL PROTECTION DEPRIVATION**

Defendants are alleged to have violated the Equal Protection Clause of the Fourteenth Amendment that prohibits states from denying any person the equal protection of the laws. Defendants are alleged to have treated Plaintiff in a different manner as others in similar conditions and circumstances.

1. **Unequal Pre-Suspension Protection**

   a. *Unequal Prosecution of a Legally Insufficient Complaint Against Plaintiff*

Hara is alleged to have violated the equal protection clause when she alleged the inquiry panel pursued disciplinary action on a legally insufficient complaint. The board will initiate an investigation when it is informed of disciplinary actions taken by hospitals, professional review proceedings, medical malpractice settlement or judgment, or hospitals who have been allowed to resign from hospitals for medical misconduct. A complaint from CPHP, which is not among those listed above, cannot trigger an investigation. Hara alleges, as a result of an investigation, "the Panel found it has reasonable cause to believe . . . ." Therefore, Hara unequally applied § 12-36-118(4)(b) to investigate charges by an organization unauthorized to trigger an investigation.

   b. *Unequal Application of § 12-36-118(4)(c)*

Hara is alleged to have unequally applied § 12-36-118(9)(a) to deny Plaintiff an investigatory result under statute. The inquiry panel must make statutorily defined findings after an investigation. The finding that Plaintiff "is unable to practice medicine with reasonable skill and safety" does not fall into any category of findings. If the panel believed as Hara alleges, then a formal complaint was warranted and reference to the AGO. However, Hara unequally applied the law to Plaintiff. Accordingly, Hara violated Plaintiff's equal protection rights.

        c.     *Unequal Application of 118(9)(a)  Order*

Hara is alleged to have unequally applied § 118(9)(a) on June 6, 2007 and December 14, 2007. Hara is alleged to have made false findings of facts to deprive Plaintiff of equal protection under the MPA. On June 5, 2007 the § 118(9)(a) order asserts that Plaintiff is licensed to practice medicine in Colorado. In fact, Plaintiff's medical license had expired and, thus, Plaintiff was unable to practice medicine in Colorado. Also, the order asserts a finding of fact that the inquiry panel reviewed Plaintiff's mental and physical condition. However, Plaintiff has never released medical information to CMB. Moreover, the panel cannot have reviewed Plaintiff's information on May 16, 2007 because the 30 day notice letter was sent on June 5, 2007. Hara asserts in the order that the panel determined that Plaintiff was unable to practice medicine with reasonable skill and safety, even though the panel lacked Plaintiff's medical record or other evidence to support such a finding. Accordingly, Hara allegedly unequally applied the MPA in violation of the Fourteenth Amendment.

Hara is alleged to have issued the § 118(9)(a) order in an act clearly in absence of her jurisdiction. The board does not delegate program directors the authority to issue § 118(9)(a) orders. Medical Board Policy 10-11 (2003) explicitly proscribes Hara from issuing a § 118(9)(a) order. Also, Section 12-36-118(9)(a) specifically mandates that the order under this statute be issued by the board— not the inquiry panel or the program director. Therefore, there is evidence that Hara acted in clear absence of jurisdiction to issue the § 118(9)(a) order in violation of the MPA and medical board policy.

Hara allegedly abused the medical practice act when she issued the 118(9)(a) order for a collateral purpose it was not intended. Under 118(9)(a) order, the board may "require a licensee to

submit to mental and physical examinations by physicians designated by the board." Rather than order Plaintiff to submit to a mental and physical exam, Hara ordered Plaintiff to (1) contact CPHP, schedule an appointment, (2) provide any information requested by CPHP, (3) schedule timely appointments as requested or recommended by CPHP, (4) cooperate fully with CPHP, (5), continue thereafter to fully cooperate with CPHP in a timely manner, and (6) comply with any and all requests or recommendation CPHP deems appropriate. Demands in far excess of what the statute allows is evidence that Hara unequally applied §12-36- 118(9)(a) against Plaintiff.

Hara is alleged to have unequally applied § 12-36-118(9)(a) to Plaintiff because it lacked probable cause. An order under §12-36-118(9)(a) must only be issued "if the board has reasonable cause to believe that a licensee is unable to practice with reasonable skill and safety because of a mental or physical condition. Reasonable cause exists when "the totality of the circumstances known to the Inquiry Panel at the time of the issuance of the order warrant the reasonable and prudent belief." *See* Rule 280. On May 16, 2007, when Hara alleges the inquiry panel issued the order, the only evidence the inquiry panel could have possessed was CPHP's charge against Plaintiff. Yet, the charge does not accuse Plaintiff of not being able to practice medicine safely. Rather, the charges against Plaintiff omit any facts about Plaintiff's medical competency. The charge states reasons why Plaintiff was referred to CPHP and alleged mood disorder without any supporting evidence. The charge lacks reference to any patient that was harmed by Plaintiff. CPHP, who filed the charge, clearly had no evidence to substantiate assertions since the § 118(9)(a) order required Plaintiff "to bring all records of any psychiatric evaluation or medical assessment of yourself conducted any time in the preceding five years" to CPHP. If Hara had the evidence to make the accusation that Plaintiff's mental condition prevented him from safely practicing medicine, then it would not be necessary for Hara to order Plaintiff bring information which CPHP—the charging party—allegedly already had. The above evidence supports allegations that Hara equally misapplied § 12-36-118(9)(a) and Medical Board Rule 280 against Plaintiff.

Hara allegedly issued the 118(9)(a) order in a different manner than White physicians under similar conditions and circumstances. There is evidence that Hara had not issued the § 118(9)(a) order against a White physician. There is also evidence that the § 118(9)(a) was never issued to a White physician who was not charged with a drug, alcohol, or domestic violence crime. Therefore, Hara allegedly abused her jurisdiction and misapplied § 118(9)(a) in a discriminatory manner because Plaintiff is Black. Accordingly, Hara violated Plaintiff's equal protection rights of the Fourteenth Amendment when she issued the § 118(9)(a) order against him.

### 2.      Unequal Suspension

Hara is alleged to have unequally applied summary suspension pursuant to § 118(9)(a) on June 28, 2007 and January 10, 2014. Hara lacked authority to issue the suspension order. First, medical board policy 10-11 explicitly prohibited Hara from issuing the suspension order.

Second, Hara and the inquiry panel lacked the jurisdiction to take disciplinary action of summary suspension under § 118(9)(a). The MPA specifically defines a quorum of the board as "three members of the inquiry panel, or three members of the hearings panel." Section 118(9)(a) provides that "if a licensee fails to submit to mental or physical examination, *the board* may *suspend* the license *until the required examinations are conducted.*" (Emphasis added.) Hara asserts in the suspension order that "pursuant to § 12-36-118(9)(a), the panel is authorized to summarily suspend respondents [*sic*] license to practice medicine in the State of Colorado pending further disciplinary proceedings.

Hara is alleged to have unequally applied § 118(9)(a). Under the statute, only the "board"—but not the inquiry panel—has the jurisdiction to issue the 118(9)(a) order and the suspension order. Also, Hara unequally applied the statute by claiming it allowed the panel to *summarily* suspend Plaintiff's license. Finally, Hara unequally applied the statute by claiming the summary suspension extends "pending further disciplinary proceedings" whereas the statute actually states that the suspension is "until the required examinations are conducted."

Hara is alleged to have unequally applied the statute to Plaintiff. The underlying § 118((9)(a) order was improperly applied to Plaintiff. The suspension was misapplied to Plaintiff as a result of the §

118(9)(a) order requiring Plaintiff to undergo a physical and mental examination. CPHP had previously performed a physical and mental examination on Plaintiff. Therefore, Hara had unequally applied the § 118(9)(a) suspension when Plaintiff had complied with the order.

This claim alleges that Hara and the inquiry panel lacked the jurisdiction to take disciplinary action of summary suspension under § 118(9)(a).

This claim further alleges that Hara denied Plaintiff equal protection of the law when lacked findings that Plaintiff had violated the MPA. The 118(9)(a) suspension lacked findings that Plaintiff had violated the order to undergo a physical and mental examination. In truth, Plaintiff, on September 8, 2005, Plaintiff met with CPHP Associate Medical Director, who performed a complete assessment, including a physical and mental examination. Therefore, Defendants cannot claim that Plaintiff's failed to comply with the § 118(9)(a) order. Yet, this is precisely what Defendants have stated caused the suspension order.

Hara is alleged to have issued the § 118(9)(a) suspension in a different manner than White physicians under similar circumstances and conditions. There is evidence that Hara had not issued the 118(9)(a) suspension against a White physician, Moreover, there is evidence that the 118(9)(a) suspension was not issued to a White physician who had complied with the physical and mental examination of the order. Therefore, Hara allegedly abused her jurisdiction and misapplied § 118(9)(a) law in a discriminatory manner because Plaintiff is Black. Accordingly, Hara violated Plaintiff's equal protection rights of the Fourteenth Amendment when she issued the § 118(9)(a) suspension order against him.

### 3.        Unequal Post-Suspension Protection

Defendants are alleged to have unequally applied post-suspension law in violation of equal protection rights under the Fourteenth Amendment. Under Medical Board Rule 280 and APA statute, all licensees who have their license suspended are accorded a pre or post-suspension hearing. Hara's suspension orders on June 28, 2007 and January 10, 2014 omitted notice of the available post-suspension hearing. Plaintiff repeatedly requested a post-suspension hearing but was ignored.

Hara lacked authority to deprive Plaintiff a post-suspension hearing. The medical board has not delegated Hara duties to deny Plaintiff a post-suspension hearing under Medical board policy 10-11. Thus, Hara acted in clear absence of jurisdiction to deprive Plaintiff of rights that accorded all summarily suspended licensees.

Hara is alleged to have actively obstructed Plaintiff from obtaining a post-suspension hearing. In the morning of December 10, 2007, Plaintiff called the Colorado Attorney General's Office ("AGO"). Plaintiff was referred to an AG responsible for CSBME legal matters, who informed Plaintiff that the AGO had no record of his case. Plaintiff related the history of the case to a second more, senior AG. The AG determined that:

1.   CMB and Hara were both clients of the AGO and, therefore, Plaintiff could not properly raise complaints against Hara with the AGO. (Plaintiff had merely requested that AG file the action in Administrative Law Courts.)

2.   AGs would inform Hara of their conversation with Plaintiff but, since this matter had not been referred to their office and, because Hara was a client, hey would not initiate an investigation or hearing regarding the summary suspension of Plaintiff's license.

3.   Plaintiff could not expect to receive any assistance or support from their office in the future. Upon belief and information, AG notified Hara of conversation with Plaintiff. Hara's refusal to refer the matter to the AGO as required under § 12-36-118(4)(c)(IV)(A) is additional evidence of Hara denying Plaintiff equal protection of the law.

Also, Hara is alleged to have deprived Plaintiff of equal rights under APA by issuing an unlawful complaint. Under § 24-104(3)(a) of the APA, "no . . . suspension . . . shall be lawful unless . . . the agency has given the licensee notice in writing of objective facts or conduct established upon a full investigation that may warrant such action . . . ." Hara is alleged to have issued an unlawful suspension under § 24-104(3)(a) when she failed to Plaintiff with "findings of facts" and "conduct determined from a full investigation. The APA mandates that there be a proceeding on any suspension and the proceeding be filed by a complainant stating the complaint and the grounds for the requested action. § 24-4-104(5).

A licensee cannot be suspended until after the hearing. § 24-4-104(6). On November 20, 2007 and ___,

Plaintiff requested a hearing but was denied., Since Plaintiff did not have a hearing although he

requested one and the suspension order was legally insufficient, , Hara is alleged to have suspended

Plaintiff unlawfully.

Hara is alleged to deprive Plaintiff of equal access to post-suspension notice and hearing because

of his race.  Hara is alleged to have denied Plaintiff his post-suspension notice and hearing when a White

licensee would be allowed notice and hearing under similar circumstances and conditions.  There is

evidence that Hara has not deprived White physicians of suspension notice and hearing.  Moreover, there

is evidence that medical board rule 280 and APA statutes requiring post-suspension notice and hearing

are applied to White licensee but was not equally applied to Plaintiff because of his race.  .  Therefore,

Hara allegedly abused her jurisdiction and unequally applied laws and rules of post-suspension notice

and hearing in a discriminatory manner because Plaintiff is Black.  Accordingly, Hara violated Plaintiff's

equal protection rights of the Fourteenth Amendment.

McGovern is alleged to have deprived Plaintiff of his equal protection rights.  McGovern denied

Plaintiff access to the medical board on August 18, 21, September 5, 8-11, 15, 17, and October 15, 2014.

On September 17, 2014 e-mailed Plaintiff:

> *I previously requested that you direct your communication to my attention.  Your*
> *continuous attempts to circumvent the process by contacting various members of my staff,*
> *the CPHP staff, and individual board members at the place of employment is*
> *inappropriate.*

The medical board has not delegated McGovern with the authority to deny access to the board.  Thus,

McGovern acted in clear absence of her jurisdiction.  Moreover, McGovern lacks authority to adjudicate

the petition for appeal of suspension.  Yet, on October 15, 2014, McGovern denied Plaintiff's petition in

a clear absence of jurisdiction.

McGovern is alleged to have deprived Plaintiff of equal protection under the law because of his

race.  Similarly situated White licensees are not denied access to the medical board when they are

entitled under the MPA and the APA to this right.  There is evidence that McGovern has not deprived

42

White licenses of their rights to hearing on the suspension.  MPA and APA laws apply to all licensees but Plaintiff was singled out from protection of these laws because of his race.

### D.    CONSPIRACY TO VIOLATE RIGHTS IN VIOLATION OF 42 U.S.C. § 1983

This claim alleges that Defendants conspired to deprive Plaintiff of constitutionally and federally protect rights under color of state law.  Defendants allegedly conspired, under color of state law, with RMCC through CPHP to deprive Plaintiff of property interest without due process in violation of the Fourteenth amendment, an action which is remediable under § 1983.  Defendants' conspired, under color of state law, with CPHP to deprive Plaintiff of liberty interests without due process in violation of the Fourteenth Amendment.

### 1.    Conspiracy to Violate 42 U.S.C. § 2000(a)

Also, there is substantial evidence that Defendants, under the color of state law, acted unconstitutionally and beyond their normal duties to violate 42 U.S.C. § 2000(a).    Defendants are alleged to have conspired with CPHP and RMCC to violate 42 U.S.C. § 2000(a) of the Civil Rights Act of 1964.

Section 2000(a) provides:

> *All persons shall be entitled to the full and equal enjoyment of the goods, services,*
> *facilities, privileges, advantages, and accommodations of any place of public*
> *accommodation, as defined in this section, without discrimination or segregation on the*
> *ground of race, color, religion, or national origin.*
> * * * *
> *Each of the following establishments which serves the public is a place of public*
> *accommodation within the meaning of this subchapter if its operations affect commerce,*
> *or if discrimination or segregation by it is supported by State action: ...*

The Department of Regulatory Affairs—Defendants' employer—functions satisfies all elements of a "place of public accommodation":  (1) it serves the public, (2) its operations affect commerce, and (3) is supported by state action.  Therefore, the state agency is a "place of public accommodation" within the meaning of the subchapter.

Defendants allegedly conspired with CPHP and RMCC to deprive Plaintiff of full and equal enjoyment of the privileges and benefits of his medical license for at least eight years in violation of §

2000(a) because of his race.  Accordingly, Defendants' are alleged to violate rights secured by 42 U.S.C. § 2000(a) in violation of § 1983.

### 2.    Conspiracy to Violate 42 U.S.C. § 2000(e)-2 and (e)-3 Conspiracy

Defendants, under color of law, are alleged to have conspired with RMCC to deprive Plaintiff of "employment opportunities or otherwise adversely affect status as an employee" because of his race.  *See* Section 2000(e)-2 of the Civil Rights Act of 1964.  Also, Defendants are alleged to have conspired, under color of law, with RMCC in post-employment retaliation against Plaintiff for filing a Title VII suit against his former employer. *See* § 2000(e)-3 of the Civil Rights Act of 1964. Also,        Defendants are alleged to conspire indirectly with RMCC through CPHP to deprive Plaintiff of employment opportunities by the indefinite suspension of the medical license.  Consequently, there is ample evidence that the suspended license prevented Plaintiff from employment in medicine for eight years. Accordingly, Defendants' are alleged to violate rights secured by 42 U.S.C. § 2000(e)-2 and (e)-3 in violation of § 1983.

### 3.    Conspiracy to Violate Equal Protection

This claim also alleges that, under the color of law, Hara conspired with Colorado state judiciary to deprive Plaintiff of equal protection rights because of Plaintiff's race.  There is evidence that Hara, through her attorney, conspired with the Honorable Anne Mansfield from August 25, 2009 to December 22, 2009 and then with Honorable William Hood from January 14, 2010 to March 10, 2010 to prevent Plaintiff from equal access to State courts.  Evidence documented in the Integrated Colorado Online Network (ICON) demonstrates that Hara's attorney and/or CPHP attorneys engaged in ex parte communication with State judges on:  (1) October 5, 2009, (2) October 7, 2009, (3) October 9, 2009, (4) October 19, 2009, (5) October 29, 2009, (6) December 17, 2009, (7) January 20, 2010, (8) January 27, 2010, (9)  February 8, 2010, (10) February 22, 2010, (11) February 22, 2010,  and (12) April 5, 2010.

Hara's alleged collusion with State judiciary influenced the State Court to adopt all proposed orders without a single change.  Ex parte communications resulted in court orders to (1) issue a cost bond of $15,000 then raised to $25,000, (2) reopen case after falsely certifying to court about sending

notification of the cost bond to Plaintiff, (3) strike Plaintiff's motion to proceed in forma pauperis, and (4) dismissal of the complaint with prejudice. Every ruling by the court was an adoption of proposed order and all lacked findings fact and conclusions of law. Overt acts of ex parte communication and intent-to-influence was documented in the order: "The Court, having reviewed the motion, and otherwise advised in the premises, hereby orders as follows . . . ."

## VIII.   CONSPIRACY IN VIOLATION OF 42 U.S.C. §1985(3)

A.   **Conspiracy to Suspend Medical License**

This § 1985(3) claim alleges that Defendants conspired with RMCC through CPHP to suspend Plaintiff's medical license. As described above, the facts demonstrate Defendants and CPHP communicated and appeared to have a meeting of the minds on how to suspend Plaintiff's license. CPHP and RMCC communicated with the objective to provide pretext for RMCC terminating Plaintiff. RMCC could in litigation benefit by the suspension of Plaintiff's license. The trigger for the conspiracy is alleged to be RMCC's discrimination against Plaintiff and subsequent employment termination. Also, Defendants are alleged to have conspired with RMCC to retaliate against Plaintiff for filing a Title VII lawsuit against RMCC.

Evidence for the conspiracy is supported by the following facts. RMCC had contacted CPHP to refer Plaintiff for behavioral problems with staff. There is no evidence from RMCC or patients that Plaintiff had engaged in improper conduct with his patients. The CPHP medical director did not identify any issues of unprofessional misconduct with Plaintiff. If the medical director had any concerns about Plaintiff's conduct, it is unlikely he would have discharged him after the third meeting. On or around November, 2005, the medical director of CPHP stated that Plaintiff's referral to CPHP was groundless and he no longer had to follow up with CPHP. Beginning within a few months after Plaintiff complained to the EEOC about racial discrimination —in or around July of 2006—CPHP required Plaintiff attend a course for physicians who have violated sexual boundaries with patients. Therefore, no probable cause exists for CPHP to believe that Plaintiff had engaged in professional misconduct.

The claim alleges that, almost immediately after Plaintiff filed an EEOC charge, RMCC met with CPHP and formed a defense that after acquired-evidence demonstrated Plaintiff engaged in professional misconduct. This evidence would consist of Plaintiff attendance at a course for physicians who had engaged in improper conduct with patients. If Plaintiff did not agree to attend course, he would be reported to the CMB. When Plaintiff refused CPHP's recommendation, CPHP allegedly conspired with Hara, in overt actions beyond her jurisdiction to create illegitimate documents that Plaintiff must comply with CPHP's recommendations or face indefinite suspension. When Plaintiff still did not comply with fake § 118(9)(a), Hara allegedly fabricated and issued a false medical suspension order to immediately and indefinitely suspend Plaintiff's medical license.

In sum, this claim alleges that there was agreement among defendants and CPHP to unlawfully coerce Plaintiff into an admission of guilt concerning patient misconduct. Defendants then met with and agreed with CPHP on the object of the plan. Defendants allegedly engaged in extortion. CPHP allegedly engaged in extortion by coercing Plaintiff into admitting professional misconduct or be reported to the medical board. Hara signed and issued a fake document that Plaintiff must comply with all CPHP's demands or have his medical license suspended. Hara then is alleged to have corruptly and malicious suspended the medical license and reported him to the National Practitioner Data Base.

Defendants are alleged to have conspired with CPHP orders pursuant to § 12-36-118(9)(a) and Orders of Suspension that resulted in the indefinite suspension of Plaintiff's medical license from June 28, 2007 until this very day because of Plaintiff's race. Moreover, Program Directors performed or cause to be performed reports to the National Practitioner Data Bank that Plaintiff's medical license was suspended because of Plaintiff's race. Consequently, Plaintiff was denied renewal or application for medical license in other states.

Defendants are alleged to have conspired with CPHP and RMCC to destroy Plaintiff's livelihood and reputation because Plaintiff is Black and he engaged in protected activity of filing a Title VII suit against former employer. Therefore, Defendants allegedly conspired to interfere with Plaintiff's rights and privileges as a result of discriminatory animus.

Defendants allegedly intended and succeeded in the deprivation of valuable property and privileges Plaintiff had rightfully obtained merely because of his race and participation in protected activity.  Therefore, Defendants conspiratorial actions are motivated by racial animus.

These allegations are supported with particularity and specificity.  Hara allegedly was aware and agreed to the conspiracy with CPHP between May 17, 2007 and June 5, 2007.  On June 5, and 6, 2007, Hara performed the first overt act of the conspiracy by issuing the § 118(9)(a) order.  On June 28, Hara performed the second overt act of the conspiracy by issuing the suspension order.  On June 29, Hara performed the third overt act of the conspiracy by reporting Plaintiff to the NPDB.  On or around June 29, Plaintiff fourth overt act consist of publicly publishing Plaintiff's suspension.

McGovern is alleged to be a member of the conspiracy and committed her first overt act on August 18, 2014 when Plaintiff e-mailed inquired what he must do to have the suspension lifted.  McGovern responded that Plaintiff must comply with the "board's order."  McGovern's alleged second overt act of the conspiracy is her multiple references to the "board's order" when she knew that Hara had issued the fake and/or forged documents.  McGovern allegedly committed a third overt act when obstructed Plaintiff's petition.  A final overt act allegedly occurred when she denied Plaintiff's petition.

There is substantial evidence of a meeting of the minds between Defendants and CPHP.  Hara's June 6, 2007 letter and 118(9)(a) order to Plaintiff and to CPHP.  The June 28 suspension order states that CPHP notified Hara that Plaintiff "has not complied with the June Order."  On December 17, Hara issued a second letter and 118(9)(a) order that was sent to Plaintiff and to CPHP.  On January 10, 2008, the second order of suspension stated that CPHP notified Hara on January 2, 2007 and "orally reported" on January 8, 2008 that Plaintiff had not complied with the 118(9)(a) order.

Defendants allegedly willfully participated in the unlawful plan with the intent to cause irreparable injury to Plaintiff because of his race and to gain a litigation advantage for RMCC in a Title VII lawsuit.  Plaintiff filed an EEOC claim against his RMCC for racial discrimination and retaliation.  He subsequently filed a Title VII suit against employer for these same claims.  After Plaintiff filed an EEOC claim, there is evidence that Defendants' conspired with CPHP and former employer.  Plaintiff's

47

race was at issue in Plaintiff's termination and in establishing pretext that Plaintiff was not terminated because of race. But for Plaintiff's race, there would not be a conspiracy for Defendants to participate. Thus, this claim alleges that Hara and McGovern participated in the conspiracy knowing that the raison d'etre was Plaintiff's race.

This claim alleges that Hara and McGovern knew and were informed that their roles in the conspiracy were unlawful and violated State and Federal due process procedures. On November, 19, 2007, Plaintiff sent letters to Hara's supervisor and second level supervisor about Hara's alleged unlawful actions. Hara's retaliated by re-suspending Plaintiff but this time alleging suspension was caused by professional misconduct that harmed patients. On August 18, 21, and September 5, 2014, Plaintiff communicated to McGovern that he believed the order of suspension was illegitimate and invalid. Nevertheless, McGovern's asserted that Plaintiff's only recourse was to comply with CPHP's recommendations and obstruct Plaintiff's petition to the medical board.

Defendants agreed to allegedly commit and committed overt unlawful acts under state and federal laws. Hara's overt acts consisted of violations of state and federal law when issuing the 118(9)(a) order and suspending Plaintiff's medical licenses under 118(9)(a). Also, Hara allegedly violated federal law when she reported the medical suspension to the NPDB. McGovern's overt acts in violation of state and federal laws consisted of obstructing justice and aiding and abetting maliciously filed false and forged documents. These overt acts, among other laws, violated Plaintiff's Fourteenth Amendment rights.

**B.   Conspiracy to Deny Access to State and Federal Courts**

Defendants' are alleged to have conspired with the state's Attorney General's Office and federal magistrates to deprive Plaintiff of rights enjoyed by a White person because of his race.

*First Alleged Conspiracy with Attorney General Office and Magistrate Judge*

On January 9, 2008, Plaintiff filed a complaint against Hara in federal court in forma pauperis under § 1915. On February 21, 2008, Assistant Attorney General ("AAG") William V. Allen e-mailed Plaintiff: "I was hoping to talk with you about the lawsuit you filed against the medical board. If you

48

could call me at the number below at your convenience we can talk about your lawsuit." The following day, Plaintiff called AAG Allen. According to Plaintiff's notes, AAG Allen communicated to Plaintiff that he should dismiss his complaint or the court would dismiss it.  Three days after AAG Allen's thinly veiled threat, Plaintiff's § 1915 petition was referred by magistrate judge to a senior district judge, who was unassigned to the case,  pursuant § 1915(e)(2).   On March 3, 2008, the senior judge neglected to address the § 1915 petition but rather sua sponte dismissed the complaint on the affirmative defense of immunity. There is no evidence that the senior judge considered the complaint as to whether it was frivolous, malicious or failed to state a claim upon which relief may be granted.  The senior judge's dismissal of the complaint, presumably under Rule 12(b), is alleged to be inappropriate.   In sum, a person, knowing the totality of the facts and circumstances, the temporal proximity and the nature of the threat to influence the federal court, would reasonably call into question whether Hara—visa-a-vis AAG Allen--improperly influenced the court to dismiss the complaint.

*Second Alleged Conspiracy With AAG and Magistrate Judge*

On June 6, 2008, Plaintiff filed an amended complaint under the belief that the action was dismissed pursuant to § 1915(e)(2). Also, on June 6, 2008, Plaintiff e-mailed AAG Allen about the "re-filed amended complaint." On June 11, 2008, when the amended complaint was presented to district court, the senior judge stated the Second Amended Complaint is inappropriate" because she had "dismissed the complaint." Subsequently, Plaintiff filed a new complaint and petitioned the district court to proceed in forma pauperis.  The magistrate judge "ordered that the court review the complaint pursuant to 28 U.S.C.  § 1915(e)(2)(B)."  On July 23, the senior judge dismissed the second complaint on the affirmative defense that Hara had absolute immunity albeit for a different reason claimed in the first complaint.  All evidence speaks to it being dismissed under Rule 12(b) rather than § 1915. . Based on a second proceeding where the complaint was allegedly improperly dismissed, a person would believe—as Plaintiff did—that the court was influenced to dismiss the second complaint  by Hara acting through her AAG Allen.

*Third Alleged Conspiracy with Magistrate Judge*

On February 23, 2015, Plaintiff filed a third complaint against Hara in U.S. District Court and applied to proceed in forma pauperis pursuant to § 1915. [Case #: 1:15-cv-00374-GPC, D.E. 1, 3, 4]. Plaintiff provided ample evidence that he was indigent so that the magistrate judge needed only to refer the matter to the district court judge for review pursuant to § 1915(e)(2)(B). However, the magistrate judge has refused to take action in violation of his official duty, and, thereby, has committed an overt unlawful action in furtherance of a conspiracy. A jury, knowing that the magistrate judge knew or should have known that his failure to perform judicial duties constituted a violation 28 U.S.C. § 351.

*Overt Action and Race*

Plaintiff alleges that suspected co-conspirators' overt actions were motivated by Plaintiff's race. Evidence supports Hara having a meeting of the mind with AAG Allen to cover-up her allegedly racially motivated actions. AAG Allen's overt, unlawful, and unethical actions of intimidating Black pro se licensee seeking due process but not similarly situated White licensees infers a racial motivation. Also, evidence supports McGovern having a meeting of the mind with AAG Allen. The successful plan was for AAG Allen to influence federal magistrates to dismiss complaints against Hara in 2007 and bury the complaint against Hara and McGovern in 2015. Defendants' are alleged to have agreed on this plan with conspirators because Plaintiff raised concerns about racial discrimination.

## IX.   PRAYER FOR RELIEF

WHEREFORE Plaintiff prays this Court issue equitable relief as follows:

1.   Issue injunctive relief commanding the Colorado Medical Board, on behalf of Defendants, reverse the summary suspension against Plaintiff and expunge all records of suspension from plaintiff's records.

2.   Issue declaratory relief as this Court deems appropriate and just.

3.   Issue other relief as this Court deems appropriate and just.

4.   Award Plaintiff his costs of litigation

Respectfully submitted,

Paul A. Mitchell
508 E. Mulberry Street
Goldsboro, NC  27530
(919) 344-5666

## STATEMENT OF VERIFICATION

I have read the above complaint and it is correct to the best of my knowledge.

Paul A. Mitchell